**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

MARJORIE I. B.,

                                   Plaintiff,

vs.

COMMISSIONER OF SOCIAL SECURITY,

                                  Defendant.

)
)
)
)
)
)  Civil No. 17-cv-665-JPG-CJP
)
)
)

**MEMORANDUM AND ORDER**

In accordance with 42 U.S.C. § 405(g), plaintiff, Marjorie I. B., seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

**Procedural History**

This case has an incredibly long duration approaching ten years from the alleged onset date, and nearly eight years since plaintiff filed for benefits. In that time period, plaintiff has had three evidentiary hearings, a successful appeal to this Court, a successful appeal to the Appeals Council, and has now returned to this Court for review.

Plaintiff first applied for benefits in September 2010, alleging disability beginning on August 14, 2008. (Tr. 13). After holding an evidentiary hearing, ALJ Michael Scurry determined plaintiff became disabled beginning February 5, 2010 (Tr. 13-23). On December 17, 2013, the Appeals Council denied plaintiff's request for review, and ALJ Scurry's decision became the first final agency decision. (Tr. 767). Administrative remedies were exhausted and plaintiff timely filed her complaint with this Court on February 6, 2014.

In January 2015, upon this Court's review, ALJ Scurry's decision was reversed and remanded to the Commissioner for rehearing and reconsideration of the evidence. Subsequently,

plaintiff had a second evidentiary hearing where ALJ Scurry again determined plaintiff was not disabled from August 14, 2008, through February 4, 2010. (Tr. 817-30). On September 11, 2015, plaintiff timely filed written exceptions with the Appeals Council. (Tr. 838). On May 23, 2016, the Appeals Council determined ALJ Scurry's evaluation of Plaintiff's symptoms was not compliant with this Court's previous remand order. (Tr. 838). The Appeals Council remanded ALJ Scurry's decision and directed that a different ALJ preside over plaintiff's case. (Tr. 838-40).

On September 14, 2016, plaintiff had her third evidentiary hearing in front of a new ALJ, Matthias D. Onderak. ALJ Onderak issued his decision on October 11, 2016, determining plaintiff was not disabled from August 14, 2008, through February 4, 2010. (Tr. 705-20). Plaintiff timely filed written exceptions dated October 13, 2016, with the Appeals Council. (Tr. 997-1000). On April 28, 2017, the Appeals Council denied review, and ALJ Onderak's decision became the second and most recent final agency decision. (Tr. 695-701). Plaintiff exhausted administrative remedies and has filed a timely complaint with this Court.

## Plaintiff's Arguments

Plaintiff makes the following arguments:

1. The ALJ erred in his analysis of the opinion evidence by (a) failing to comply with SSR 83-20 and this Court's 2015 Order; (b) relying on state agency consulting physicians; (c) engaging in flawed analysis of Dr. Wilkey's opinion; and (d) relying illogically upon objective evidence.

2. The ALJ erred by basing his RFC determination on an impermissible, illogical, and speculative credibility finding.

3. The ALJ erred by failing to address important evidence that contradicts his finding plaintiff was not disabled prior to February 5, 2010.

## Legal Standards

To qualify for benefits, a claimant must be "disabled" pursuant to the Social Security Act. The Act defines a "disability" as the "inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The physical or mental impairment must result from a medically demonstrable abnormality. 42 U.S.C. § 423(d)(3). Moreover, the impairment must prevent the plaintiff from engaging in significant physical or mental work activity done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations require an ALJ to ask five questions when determining whether a claimant is disabled. The first three questions are simple: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe physical or mental impairment; and (3) whether that impairment meets or is equivalent to one of the listed impairments that the regulations acknowledge to be conclusively disabling. 20 C.F.R. § 404.1520(a)(4); *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011). If the answers to these questions are "yes," then the ALJ should find that the claimant is disabled. *Id.*

At times, an ALJ may find that the claimant is unemployed and has a serious impairment, but the impairment is neither listed in nor equivalent to the impairments in the regulations—failing at step three. If this happens, then the ALJ must ask a fourth question: (4) whether the claimant is able to perform his or her previous work. *Id.* If the claimant is not able to, then the burden shifts to the Commissioner to answer a fifth and final question: (5) whether the claimant is capable of performing *any* work within the economy, in light of the claimant's age, education, and work experience. If the claimant cannot, then the ALJ should find the claimant to be disabled. *Id.*; *see also Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

A claimant may appeal the final decision of the Social Security Administration to this

Court, but the scope of review here is limited: while the Court must ensure that the ALJ did not make any errors of law, the ALJ's findings of fact are conclusive as long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable person would find sufficient to support a decision. *Weatherbee*, 649 F.3d at 568 (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). The Court takes into account the entire administrative record when reviewing for substantial evidence, but it does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). But even though this judicial review is limited, the Court should not and does not act as a rubber stamp for the Commissioner. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

## The Decision of the ALJ

ALJ Onderak followed the five-step analytical framework described above. He found plaintiff had not engaged in substantial gainful activity from August 14, 2008, through February 4, 2010. He found plaintiff had two severe impairments: (1) lumbar degenerative disc disease with L5-S1 disc herniation, status-post fusion; and (2) obesity. However, ALJ Onderak found that her impairments did not meet or medically equal the severity of a listed impairment.

ALJ Onderak found the same residual functional capacity (RFC) as the previous ALJ in that plaintiff had the RFC to perform work at the light level prior to February 5, 2010. (Tr. 16-21). From August 14, 2008, through February 4, 2010, ALJ Onderak did note her ability to substantially perform all requirements of this level work was impeded by additional limitations.

ALJ Onderak relied on the Vocational Expert's (VE) opinion provided at plaintiff's first evidentiary hearing in July 2012 to determine plaintiff could have performed other jobs which

existed in significant numbers in the national economy from August 14, 2008, through February 4, 2010. Based on the ALJ's RFC determination and the Vocational Expert's 2012 testimony, the ALJ concluded that the plaintiff was not disabled from August 14, 2008, through February 4, 2010.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff and is confined to the relevant time period.

### 1. Agency Forms

Plaintiff was born in 1964, and was forty-four years old on August 14, 2008, the amended alleged onset date. (Tr. 107). She was insured for DIB through December 31, 2012. (Tr. 134).

Plaintiff was five feet, five inches tall and weighed two hundred and eighty pounds at the time of her application. (Tr. 146). Prior to applying for DIB, plaintiff previously worked as a cook at a nursing home and at a county jail. (Tr. 147). She indicated several conditions that limit her ability to work: back injury; obesity; diabetes; high blood pressure; and depression, and that her conditions cause her pain or other symptoms. (Tr. 146).

### 2. Evidentiary Hearing

Plaintiff was represented by an attorney at the third evidentiary hearing on September 14, 2016. (Tr. 727). ALJ Onderak swore in plaintiff and informed her he would focus on "…the dates prior to you actually filing for disability," August 14, 2008, through February 4, 2010. (Tr. 732). Then, plaintiff's attorney addressed the ALJ and explained his client had twice testified under oath regarding the dates in which the ALJ wished to focus. He informed ALJ Onderak plaintiff reviewed her prior testimony and wished to stand on it, rather than provide duplicative or

inaccurate testimony. Plaintiff was more confident in the accuracy of her earlier testimony because it was provided earlier in time. Her attorney explained if the ALJ had new areas to discuss or ask her, then plaintiff would certainly provide testimony to the best of her ability. (Tr. 732-33).

ALJ Onderak's questioning focused on why plaintiff "finally" decided to file for disability in September 2010. She explained she filed because she could not go back to work. (Tr. 734-35). ALJ Onderak attempted to get to a "reason" plaintiff filed at that "particular time," and he specifically asked plaintiff whether anyone told her she would not be able to work again, either before she filed or around the time she filed. (Tr. 735). After plaintiff said she could not remember because it was a long time ago, the ALJ concluded the hearing. No other witnesses were called, nor other testimony provided. (Tr. 735-36).

ALJ Onderak summarized the first evidentiary hearing from July 2012 in his decision. (Tr. 712, 841-66).

### 3.     Medical Treatment

For context, prior to the time period directly at issue here, plaintiff first presented to her treating physician's assistant, Carol Weiler, on June 17, 2007, complaining of back pain due to an injury at work the day prior. (Tr. 383). She was treated by her orthopedic surgeon, Lawrence Leventhal, M.D., in October 2007. He prescribed physical therapy and recommended suitable levels of work activity. (Tr. 240). That month, plaintiff began physical therapy and continued therapy regularly until January 2008. (Tr. 614-29).

From January 2008 through March 2008, plaintiff received epidural injections. (Tr. 264, 266-67, 270-72, 277). She felt they helped improve her symptoms at least forty percent. (Tr. 344). In April 2008, Dr. Kenneth Wilkey, M.D., conducted an independent examination at the request of

the workers' compensation insurance carrier of plaintiff and stated she was motivated to return to work and could perform work at the light level. Plaintiff's straight leg tests were negative and her gait, motor, and sensation were normal. (Tr. 344-45). Plaintiff began physical therapy again in March 2008 and continued until September 2008. (Tr. 630-35, 637, 282-86, 296).

Now, looking at the time period from alleged onset, August 14, 2008, through February 4, 2010, plaintiff saw six different physicians, had twenty examinations, engaged in recommended physical therapy, received three injections, underwent back surgery, and took pain medication. On August 14, 2008, plaintiff presented to Dr. Leventhal reporting an increase in her low back pain. She noticed the increase after a physical therapy session a few days prior, and she described her new pain as a popping and stinging sensation in her low back. (Tr. 299). Dr. Leventhal found tenderness, positive straight leg raise at seventy degrees on the right while sitting, and flexion at eighty percent of normal range. (Tr. 300). Despite plaintiff reporting that she noticed her new pain characteristics following physical therapy, Dr. Leventhal recommended continuation in physical therapy. (Tr. 300-04, 554). The corresponding physical therapy record noted plaintiff's abnormal gait, and the physical therapist also recommended she continue in therapy with the goal of increasing her strength and flexibility while decreasing her pain. (Tr. 300-04, 554).

Plaintiff saw Dr. Leventhal twice in September 2008. At her first September visit, plaintiff reported her constant pain became severe intermittently, and worsened when carrying and walking at the same time and when standing too long. She had negative straight leg results, her range of motion was normal, but she did continue to have tenderness to palpation. (Tr. 304-11). Her treatment plan report described plaintiff's low back pain as improving, but she still exhibited some continued weakness. Plaintiff was not cleared for work. (Tr. 303, 561).

By her second September 2008 visit, Dr. Leventhal noted plaintiff's increasing pain now

included shooting pain down her right thigh. She described the pain as producing a shooting and shocking sensation, and informed Dr. Leventhal she had problems sleeping, and experienced restlessness throughout the night. Dr. Leventhal noted plaintiff wobbled while walking, and experienced pain both when walking and sitting most of the time. Plaintiff explained her pain benefits from not moving, and she rated her pain at a five to six out of ten most of the time while taking both Darvocet and Medrol Dose Pack. (Tr. 307).

Dr. Leventhal opined in September 2008 that plaintiff had reached a plateau with therapy and determined it was no longer beneficial. (Tr. 310). X-rays revealed her spine at L4-5 had significant instability, and showed bilateral pars defects at L4-5 with grade 2 spondylolisthesis with flexion and extension; her L4 vertebrae pivoted on the anterior corner of her L5 with flexion; and she had an increased stress reaction along the anterior aspect of her L5. (Tr. 308). Dr. Leventhal opined plaintiff would require a fusion at her L4-5 level. Per the treatment record, plaintiff was unsure whether she wanted to consider surgery on September 29, 2008. Dr. Leventhal restricted plaintiff from work. (Tr. 310, 566).

Significantly, at her very next visit in October 2008, plaintiff indicated her desire to consider surgery, and Dr. Leventhal's new treatment plan consisted of referring her to a tertiary center[1]. Dr. Leventhal "discharged [her] from further active orthopedic care." Plaintiff was to remain off work. (Tr. 315).

Plaintiff had a MRI on November 11, 2008. Dr. Gurmeet Dhillon interpreted the images and concluded plaintiff had chronic bilateral L4 spondylolysis and grade 1 anterior spondylolisthesis of her L4 on L5, and associated degenerative disc disease and facet arthropathy producing moderate L4-5 foraminal stenosis. Further, he concluded plaintiff had broad left-sided

---

[1] "[S]pecialized consultative care, usually on referral from primary or secondary medical care personnel, by specialists working in a center that has personnel and facilities for special investigation and treatment." STEDMAN'S MEDICAL DICTIONARY 145510 (Nov. 2014).

L5-S1 disc herniation extending laterally into the left L5-S1 neural foramen. She also had a mild chronic anterior wedge compression fracture at her T11 vertebra with no acute fracture identified. (Tr. 317).

One week after her MRI, plaintiff saw neurosurgeon Charles A. Wetherington for an evaluation. Dr. Wetherington compared plaintiff's September 2008 X-ray and her November 2008 MRI, and found "no real significant change from the first image to the MRI." He suggested the bilateral neural foraminal narrowing was not severe, and recommended plaintiff undergo a right SI (sacroiliac) joint injection because he suspected "most of her overall discomfort [wa]s emanating from her SI joint and the sacroiliitis." Dr. Wetherington concluded his review by recommending "[w]e will elect to treat the SI joint with an injection first. If she fails to get relief, then we will try to determine whether [ ] her overall back pain is coming from the spondylolysis." (Tr. 319). Plaintiff was then referred to Dr. Brian Ogan for injections. (Tr. 326-37).

She saw Dr. Ogan seven times between December 9, 2008, and March 10, 2009, and received three injections for diagnostic and therapeutic purposes. Plaintiff's first injection was a sacroiliac joint injection in December 2008. (Tr. 326-27). However, that injection did not produce extremely favorable results so Dr. Ogan recommended trying an epidural steroid injection and nerve root block at her L4 instead of her sacroiliac joint. (Tr. 329).

She underwent the L4 injection and nerve root block twice in January 2009. (Tr. 331, 335-36). Immediately following the procedures, plaintiff had significant improvement of the burning pain in her legs, but minimal improvement overall in her low back pain. (Tr. 333, 337). Dr. Ogan noted that he believed she had a lumbar nerve root irritation, and that in connection with the findings of her imaging study, he believed her overall pain complaint was multifactorial in origin. (Tr. 334).

Between the first and second, and also after the second nerve root block, plaintiff had continued reports of pain and examination findings of bilateral tenderness over her lumbar region; reduced range of motion because of reproduced pain at flexion and extension; and positive straight leg raises that reproduced back pain with radiating pain to her lower right extremity. At plaintiff's last visit with Dr. Ogan on March 10, 2009, he recommended a new type of injection to the fractured neck of the right pars interarticularis at plaintiff's L4 level. (Tr. 336-37). There was no indication in the record whether this recommended procedure was approved by insurance, ever took place, or that the plaintiff returned to Dr. Ogan for treatment after this date. Instead, the record indicates she was sent back to Dr. Wilkey in May 2009 for a second independent medical examination. She had not seen Dr. Wilkey in over one year. (Tr. 346-47).

In May 2009, plaintiff had a limited range of motion in all planes, but had no neurological weaknesses. Dr. Wilkey opined that because conservative treatment had failed, plaintiff was a good candidate for surgery. (Tr. 346). It was his belief plaintiff had an excellent attitude and he thought she would try her best to return to work. He surmised plaintiff would need at least three months to recover after surgery. (Tr. 346-47). He also stated it may be difficult to find work due to plaintiff's obesity and having not worked for over eighteen months, as she was restricted by other treating physicians. During the exam, plaintiff reported pain that was sharp and localized to her lower central lumbar area and right buttock. She did not have weakness, numbness, or tingling. However, she reported difficulty standing greater than twenty minutes, and that her walking was limited to about a half block. Dr. Wilkey noted a "positive grocery cart sign" and that plaintiff demonstrated neurogenic claudication. Dr. Wilkey also noted plaintiff was taking Darvocet three times a day for her pain, and she had significant social and familial limitations related to her impairment and symptomology. Dr. Wilkey, in answering the third party questions,

opined plaintiff was able to work in a limited capacity, being light duty with lifting and carrying limited to thirty pounds; bending, twisting, sitting, standing, push-pull, and driving as tolerated. (Tr. 347). Dr. Wilkey continued by stating, if patient declined surgery, "I would probably request a functional capacity evaluation to obtain a more objective work limitation." (Tr. 347).

Dr. Wilkey saw the plaintiff on June 2, 2009, and noted her examination findings were unchanged from May 2009, except her straight leg results were negative. Dr. Wilkey noted plaintiff's work restrictions would remain the same. (Tr. 350). Dr. Wilkey performed spinal fusion surgery on plaintiff in July 2009. (Tr. 339-41).

On July 9, 2009, plaintiff underwent surgery consisting of several procedures: (1) segmental instrumentation L3-L5; (2) T-lift L3-4, L4-5; (3) arthrodesis posterior lateral L3-4, L4-5; (4) right iliac crest bone grafting; (5) placement of intravertebral disc spacers L3-4, L4-5; (6) neural monitoring; and (7) cell saver. Her pre-operation diagnosis was grade 2 spondylolisthesis L4-5 and severe osteoporosis. After making unanticipated discoveries during surgery, Dr. Wilkey diagnosed plaintiff with the same diagnosis pre-operation with the addition of facet arthropathy identified at L3-4. (Tr. 339-41).

Post-operatively, Dr. Wilkey prescribed pain medications and physical therapy. (Tr. 351). Plaintiff attended several follow-up visits. On July 30, 2009, she had difficulty getting up from her chair, a limited range of motion, and she walked with a limp. She was deemed stable and released to start her prescribed physical therapy. However, she was ordered to continue off work. (Tr. 350). She returned in August 2009 and reported one hundred percent leg pain improvement, but only fifty percent back pain improvement. She exhibited antalgic gate again, and the other findings in August 2009 were basically unchanged from her July visit; however, she had some radiculitis consistent with movement of the nerves. She was ordered to continue off work and

schedule a follow-up in six weeks. (Tr. 351-52).

At plaintiff's December 1, 2009, visit with Dr. Wilkey, she reported her pain had improved at least seventy percent. However, she had lost weight and reported Vicodin was upsetting her gastrointestinal functioning and it was discontinued by Dr. Wilkey, who requested Darvocet for her pain on this day. (Tr. 353). She was assessed as improved, and Dr. Wilkey surmised she could return to work shortly. When she returned to work, Dr. Wilkey's restrictions included: lifting and carrying limited to twenty pounds, and limited plaintiff to four hour shifts maximum, and bending, twisting, sitting, standing, as tolerated. Dr. Wilkey also "…indicated to her that there would be worsening back pain as she [wa]s significantly deconditioned and that [wa]s to be expected." He instructed her that Darvocet should be used to offset worsening back pain, and that she should make a follow-up appointment for six weeks. (Tr. 353).

January 12, 2010, was plaintiff's last visit with Dr. Wilkey during the relevant time period. (Tr. 353-354). Dr. Wilkey noted plaintiff sustained a setback and had plateaued at her current state of function.

> She seems to plateau at her current state of function. They attempted to put her on a bicycle and she indicates that that aggravated her back pain. She does have some right buttock and posterior thigh pain but nothing in a radicular fashion down the leg…She is taking about 4-5 Darvocet a day, when she was taking 1 to 2.

(Tr. 354).

Dr. Wilkey's assessment included plaintiff had back pain and her status post fusion was improving. She had a waddling gait with a cane and soreness on the right buttock and posterior thigh. Her straight leg test was negative. He had plaintiff discontinue therapy as she had done well up until this point. Despite noting her setback she attributed to a bicycle injury at physical therapy, noting her plateau, and discontinuing her physical therapy regimen, Dr. Wilkey opined plaintiff could return to limited duty work with a thirty pound carrying maximum, and sitting, standing,

and twisting as tolerated. (Tr. 353-54).

In February 2010, plaintiff reported to the emergency room, again complaining of increased pain. (Tr. 659). Her X-rays revealed that there was evidence of hardware failure and Dr. Wilkey again noted she had plateaued. (Tr. 659).

Plaintiff continued seeing Dr. Wilkey through September 23, 2010, but Dr. Wilkey's records from February 2010 through June 2010 are rarely referenced in the ALJ's analysis. Because plaintiff's issues significantly address Dr. Wilkey's record from September 23, 2010, the Court will only include his opinion in the below section.

### 4. Opinion of Treating Doctor

The treating doctor's opinion primarily at issue is Dr. Wilkey's September 23, 2010, opinion. Dr. Wilkey indicated plaintiff's exertional limitations and restrictions as permanent. These limitations closely resembled other restrictions that he noted earlier in his treatment of plaintiff. On September 23, 2010, Dr. Wilkey determined plaintiff's permanent restrictions included not lifting or carrying over thirty pounds, and he limited bending, twisting, sitting, standing, and driving to what plaintiff could tolerate. (Tr. 471).

### 5. State Agency Consultants' Opinions

On January 20, 2011, state agency physician, Dr. B Rock Oh assessed plaintiff's RFC. (Tr. 501-507). He reports that he reviewed medical records from Dr. Garrett's practice dated June 2007 through October 2010, and medical records from Dr. Wilkey dated April 2008 through February 2010. However, he only cited Dr. Wilkey's September 23, 2010, opinion regarding exertional limitations in his RFC assessment report. Ultimately, Dr. Oh opined plaintiff could occasionally lift twenty pounds and frequently lift ten pounds. Then, he theorized plaintiff could also stand or walk for a total of two hours in an eight hour workday, and sit for a total of six hours

in an eight hour workday. (Tr. 501). Plaintiff's postural limitations included occasional climbing, stooping, kneeling, crouching, and crawling. Though, climbing up ramps and stairs, and balancing were not indicated at all. (Tr. 502). Dr. Oh did not indicate he relied upon any other particular evidence in reaching his determination.

In April 2011, Dr. Lenore Gonzalez, of Disability Determination Services (DDS), affirmed Dr. Oh's RFC assessment. She reported reviewing all of the evidence in the file. However, she only cited to Dr. Leung's physical examination record from January 2011 and Dr. Oh's previous January 2011 determination in the "Explanation of Decision" section. (Tr. 519-22). Dr. Gonzalez does not discuss or specifically indicate that she relied on any other evidence in affirming Dr. Oh's RFC decision.

## Analysis

ALJ Onderak concluded plaintiff became disabled as of February 5, 2010, the date she presented to the emergency room and reported eight Darvocet were not controlling her pain; he found that she was not disabled from August 14, 2008, through February 4, 2010. Plaintiff raises several issues with ALJ Onderak's disability onset date determination. Plaintiff's third issue argues the ALJ failed to address important evidence that contradicts his finding plaintiff was not disabled prior to February 5, 2010.

First, plaintiff argues ALJ Onderak's characterization she "sought only conservative treatment…from August 2008 through early July 2009" (Tr. 716), which strongly suggests plaintiff's symptoms were not severe because she could have had surgery prior to July 2009, is wrong and baseless. The Court agrees.

ALJ Onderak recited a summary of plaintiff's September 29, 2008, visit with Dr. Leventhal indicating Dr. Leventhal opined surgery was probably required and that the plaintiff

was going to consider it. (Tr. 714). Then the ALJ continued by reciting a summary of the rest of plaintiff's treatment and medical records. He completely failed to include that plaintiff informed Dr. Leventhal she wished to pursue surgery in October 2008. It should be noted the ALJ included factual summaries of records multiple times throughout his decision. Those summaries are just that, nothing more than selective factual recitations without analysis.

Finally, the ALJ discussed some of the evidence. He noted in the discussion that "[t]he [plaintiff] sought only conservative treatment," (Tr. 716), and then he ultimately concluded plaintiff was not disabled from August 14, 2008, through February 4, 2010. At no point in his discussion does the ALJ acknowledge plaintiff told Dr. Leventhal she wished to pursue surgery at her October 31, 2008, visit; nor, does ALJ Onderak acknowledge that Dr. Leventhal discharged plaintiff and referred her to a tertiary center to pursue surgery as a result of that October 2008 visit. This evidence that the ALJ chose not to discuss contradicts his conclusion plaintiff "sought only conservative" treatment until July 2009, when the record is clear plaintiff stated she wanted to pursue surgery in October 2008.

Further, the ALJ failed to acknowledge and discuss plaintiff's November 11, 2008, MRI with Dr. Gurmeet Dhillon (Tr. 317), and her examination with Dr. Wetherington on November 18, 2008 (Tr. 318-19). The record is clear Dr. Leventhal referred plaintiff to both of these physicians consistent with his October 2008 discharge and referral plans. Most noticeably lacking from the ALJ's discussion of the onset date determination is that it was Dr. Wetherington, not the plaintiff, who recommended plaintiff try a right sacroiliac joint injection before undergoing surgery. This evidence also contradicts the ALJ's conclusion plaintiff "sought only conservative treatment" until July 2009.

Additionally, related to the "conservative treatment" assertion, the ALJ fails to mention in

his discussion that the record shows plaintiff diligently followed her doctors' recommendations. Although it is true plaintiff did not have surgery until July 2009 and that she did not demand surgery over injections, plaintiff, like most reasonable individuals would, opted to adhere to the advice and recommendations of physicians and medical professionals. When Dr. Wetherington recommended injections instead of surgery, she started seeing Dr. Ogan for those injections. In December 2008, when the first injection to her sacroiliac joint did not produce "favorable" results for her, she followed Dr. Ogan's recommendation not to repeat the sacroiliac joint injection, and to instead try a different injection with nerve root block at her L4 vertebra. (Tr. 329). She continued following Dr. Ogan's recommendations, and eventually on January 29, 2009, because he recommended it, plaintiff had a second injection with nerve root block to her L4 vertebra approximately three weeks after her first L4 injection with nerve root block. (Tr. 335). Again, the ALJ ignored this contradictory evidence and completely failed to analyze it when he concluded plaintiff sought only conservative treatment implying her pain was not severe or she did not want surgery, and thus she was not disabled prior to February 5, 2010.

Moreover, the records clearly indicate plaintiff was involved with a workers' compensation claim for her July 2007 and August 2007 work accidents, which eventually settled in May 2011. (Tr. 1001-1003). For example, Dr. Ogan's records are abundant with references to "Traveler's Insurance" and the name of the Traveler's claim representative. (Tr. 324, 327, 329, 332, 334, 336, 338). Dr. Ogan recommended a third type of injection on March 10, 2009, and the record indicates Traveler's Insurance was given a copy of this recommendation. However, plaintiff never returned to Dr. Ogan. Instead, the medical records indicate she saw Dr. Wilkey on May 5, 2009, for a second independent evaluation; that record includes Dr. Wilkey's answers to third-party questions, the third party being plaintiff's employer's insurance. (Tr. 347). The medical evidence

and other evidence that exists indicates plaintiff followed her physicians' and surgeon's recommendations, and importantly, that her course of treatment was influenced by her employer's insurance company's approval process throughout the entire time period ALJ Onderak was charged with assessing. Again, failure to discuss this evidence, which undermines ALJ Onderak's conservative treatment characterization, ultimately undercuts his February 5, 2010, onset date determination.

Second, plaintiff argues ALJ Onderak failed to include Dr. Leventhal's records prior to May 2009 in any type of discussion pertaining to his conclusion plaintiff was not disabled prior to February 5, 2010. Plaintiff specifically argues the ALJ failed to discuss her August 14, 2008, visit with Dr. Leventhal within his disability onset date analysis. In that August 14, 2008, record, Dr. Leventhal indicated the plaintiff's condition had deteriorated plus she was experiencing an increase in pain following physical therapy a few days prior. Plaintiff described this new pain as a sharp popping and stinging sensation in her lower back. Next, plaintiff points to the September 12, 2008, visit and corresponding physical therapy record that indicated she had weakness in a majority of her muscle groups. Last, plaintiff specifically points to her September 29, 2008, visit when Dr. Leventhal noted plaintiff plateaued, and he discontinued physical therapy because it was no longer beneficial. Significantly, Dr. Leventhal recommended surgery at this visit, and plaintiff's X-ray revealed significant instability in her lower back.

ALJ Onderak did list these three dates in his decision. However, the dates are mentioned where he inserted brief summaries of the records. ALJ Onderak never actually discussed these dates in his analysis or explained how these dates are irrelevant to his conclusion. Because this evidence is contradictory, this selective discussion of evidence erodes the foundation of his conclusion that plaintiff was "not disabled" prior to February 5, 2010.

As a result of not discussing Dr. Leventhal's records, ALJ Onderak ignored seven and a half months during the relevant time period and as a result, evidence contradictory to his ultimate conclusion. An ALJ is not permitted to "cherry-pick" the evidence in this way, ignoring the parts that conflict with his conclusion. *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009). While he is not required to mention every piece of evidence, he "must at least minimally discuss a [plaintiff's] evidence that contradicts the Commissioner's position." *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000). ALJ Onderak cherry-picked the evidence, and failed to minimally discuss contradictory evidence. This is error.

Now, turning to plaintiff's first issue, she essentially asserts that when the ALJ determined her disability onset date, ALJ Onderak failed to comply with Social Security Ruling (SSR) 83-20's framework by ignoring Dr. Wilkey's September 23, 2010, opinion.

"Where, as here, a claimant is found disabled but it is necessary to decide whether the disability arose at an earlier date, the ALJ is required to apply the analytical framework outlined in SSR 83-20 to determine the onset date of disability." *Brisco ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). Under SSR 83-20, the onset date of disability is defined as "the first day an individual is disabled as defined in the Act and the regulations." SSR 83-20, 1983 WL 31249, at \*1. In the case of slowly progressive impairments, SSR 83-20 does not require the impairment to have reached the severity of a listed impairment before onset can be established. SSR 83-20 at \*2. Instead, "[t]he onset date should be set on the date when it is most reasonable to conclude from the evidence that the impairment was sufficiently severe to prevent the individual from engaging in SGA (or gainful activity) for a continuous period of at least 12 months or result in death." *Briscoe*, 425 F.3d at 352 (quoting SSR 83-20 at \*3).

For disabilities of non-traumatic origin, like this plaintiff's disability, SSR 83-20 requires

the ALJ to consider three factors: (1) plaintiff's alleged onset date; (2) work history; and (3) medical and all other relevant evidence. SSR 83-20 at *2. The date alleged by the claimant is the "starting point" in determining the onset date, and the alleged date should be used if it is consistent with all available evidence. SSR 83-20 at *2, 3. The medical evidence is the primary element in the onset determination" and the chosen onset date "must be fixed based on the facts and can never be inconsistent with the medical evidence of record." SSR 83-20 at *2. "This does not mean that a claim is doomed for lack of medical evidence establishing the precise date an impairment became disabling." *Briscoe*, 425 F3d at 353 (emphasis in original); see SSR 83-20 at *2. When the alleged date of onset is inconsistent with the medical or work evidence, then "additional development [of the record] may be needed to reconcile the discrepancy." SSR 83-20 at *3. "In such cases, the ALJ must infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process, and should seek the assistance of a medical expert to make this inference." *Briscoe*, 425 F3d at 353 (citing SSR 83-20 at *2) (internal quotation marks omitted).

In reviewing ALJ Onderak's disability onset date determination, as the Commissioner correctly points out here (Doc. 22 at 10), when a plaintiff challenges the onset date selected by the ALJ, "the issue is whether there is substantial evidence in the record to support the date chosen by [the ALJ], not whether an earlier date could have been supported.'" *Henderson ex rel. Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999) (quoting *Stein v. Sullivan*, 892 F.2d 43, 46 (7th Cir. 1989)). The Commissioner's brief also states, and it is true, "[a]n ALJ is not required to address every piece of evidence, but instead build an accurate and logical bridge from the evidence to his conclusions. (Doc. 22 at 9, citing *Simila v. Astrue,* 573 F.3d 503, 516 (7th Cir. 2009)).

However, the Commissioner must not forget it is well-established that an ALJ "may not

analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014), collecting cases.

Although ALJ Onderak did not explicitly refer to SSR 83-20 in his onset date analysis, omitting reference to SSR 83-20 alone would not be fatal if he "nevertheless properly applied the requisite analysis." *Briscoe*, 425 F.3d at 352. However, ALJ Onderak failed to properly do so here.

Plaintiff takes issue with the ALJ's failure to discuss a September 23, 2010, opinion regarding plaintiff's limitations in determining her onset date. Here, when determining the onset date, the ALJ focused on plaintiff's capabilities prior to February 5, 2010. ALJ Onderak afforded great weight to Dr. Wilkey's April 2008, May 2009, June 2009, and January 2010 opinions regarding plaintiff's limitations because "they were rendered contemporaneously with his exams of the claimant"; "they are much more consistent with the claimant's treatment history and the objective medical evidence of record…"; and Dr. Wilkey's opinions are consistent with state agency opinions belonging to Dr. B. Rock Oh and Dr. Lenore Gonzalez. (Tr. 717-18).

As outlined above, SSR 83-20 requires that the date alleged by the claimant must be the "starting point" in determining the onset date. Notably, the ALJ cited Dr. Wilkey's April 2008 independent examination, wherein Dr. Wilkey opined plaintiff could perform light duty. Here, the Plaintiff alleged August 14, 2008, as her onset date. Pursuant to SSR 83-20, the ALJ's use of Dr. Wilkey's April 2008 opinion is improper because it disregards plaintiff's August 14, 2008, alleged onset date. The April 2008 opinion should have been excluded from the ALJ's onset decision because it predates plaintiff's alleged onset date. Only opinions rendered on or after the alleged onset date should have been considered. Therefore, the earliest applicable opinion rendered by Dr. Wilkey relevant to onset date determination would be his May 2009 opinion and those made after

then.

Furthermore, SSR 83-20 clearly states, "[t]he medical evidence is 'the primary element in the onset determination' and the chosen onset date 'can never be inconsistent with the medical evidence of record.'" *Id*. at 2. Dr. Wilkey's medical opinions are relevant, and the onset date determination of February 5, 2010, cannot be inconsistent with the medical evidence, including Dr. Wilkey's September 2010 opinion.

Here, plaintiff takes issue with ALJ Onderak's disability determination of February 5, 2010, based in part on affording Dr. Wilkey's opinions dated May 2009, June 2009, and January 2009 great weight. Essentially, plaintiff argues the ALJ's determination of "not disabled" based on the May 2009, June 2009, and January 2010 opinions is in conflict with the ALJ's determination of "disabled" as of February 5, 2010. The Court agrees.

Dr. Wilkey's September 23, 2010, opinion noted plaintiff's limitations that she could lift and carry up to thirty pounds, and bend, twist, sit, stand, and drive as tolerated. Those September 2010 restrictions are basically identical to nearly all of the applicable opinions rendered (with the exception of limitations and restrictions after her July 2009 surgery until January 2010). Although this medical evidence is outside of the time period at issue, it is still relevant because it illuminates an inconsistency in the ALJ's reasoning and treatment of evidence, not an inconsistency with the medical opinions.

In further explanation, the first ALJ, Michael Scurry, determined the February 5, 2010, onset date. This time, ALJ Onderak also decided February 5, 2010, was the proper onset date and even stated he agreed with ALJ Scurry. The key issue is that ALJ Onderak, like his predecessor, failed to address how Dr. Wilkey's opinions became less persuasive after February 2010. It is contradictory and arbitrary to assert that limitations on lifting and carrying thirty pounds, and

restrictions on bending, twisting, sitting, standing, and driving as tolerated support a finding of "not disabled" prior to February 5, 2010, but then ALJ Onderak posits that those same limitations and restrictions support a finding of "disabled" after February 5, 2010.

In failing to discuss Dr. Wilkey's September 2010 opinion, the ALJ violated SSR 83-20 when he ignored relevant evidence that was inconsistent with his chosen onset date of February 5, 2010. By failing to engage in analysis of the inconsistency, ALJ Onderak selectively relied upon evidence of a certain time period while ignoring evidence from another time period that undermines his conclusion. He also failed to sufficiently articulate reasoning that supports this. Without addressing evidence that undermines his ultimate decision, and articulating an explanation, meaningful review is prevented.

Additionally, plaintiff raises the issue that ALJ Onderak erred by relying on the State agency consultant opinions of Dr. Oh and Dr. Gonzalez in reaching his February 5, 2010, onset date determination. The ALJ reasoned that Dr. Oh's and Dr. Gonzalez's opinions were consistent with the evidence, including Dr. Wilkey's opinions. The ALJ afforded the agency consultants great weight. The Commissioner here mistook plaintiff's argument. Plaintiff argues this was erroneous because Dr. Oh and Dr. Gonzalez only cited medical records and subjective reports dated after February 5, 2010, as the basis for their 2011 conclusions of plaintiff's limitations; plaintiff's argument is not simply that it was erroneous because the agency consultants made their conclusions after February 5, 2010. Rather, plaintiff's argument put another way is that Dr. Oh's and Dr. Gonzalez's opinions are irrelevant because they each based their findings on evidence after February 5, 2010, instead of evidence dating back to her alleged onset date in August 2008 through February 4, 2010. Thus, it is erroneous for ALJ Onderak to have relied on Dr. Oh's and Dr. Gonzalez's opinions because they are irrelevant to the time period at issue in that they do not

even consider the relevant time period.

Here, Dr. Oh reviewed Dr. Leung's January 12, 2011, physical examination of plaintiff. Notably, Dr. Oh's RFC assessment was listed as a "current evaluation" and occurred before any final determination of disability was ever rendered by the Commissioner. (Tr. 500). Dr. Oh's conclusions for finding plaintiff's exertional limitations were based on plaintiff's history of degenerative spondylosis L4-5 with advanced degenerative disc, lumbago, morbid obesity, hypertension, and diabetes, and then Dr. Oh writes "[s]ee section 'IV'" of the assessment for additional comments regarding his conclusion. (Tr. 501). In section IV of Dr. Oh's "current evaluation," he directly cites Dr. Wilkey's September 23, 2010, report. Dr. Oh notes, "MSS TP Dr. Wilkey 9-23-10 report indicates interbody fusion is healed. Claimant is given restrictions on bending, twisting, sitting, standing, driving, lifting and carrying up to thirty pounds." (Tr. 507).

Interestingly, ALJ Onderak gives Dr. Oh's opinion great weight because it is consistent with Dr. Wilkey's opinions. In fact, the only reasons articulated by Dr. Oh regarding plaintiff's exertional limitations is Dr. Wilkey's September 23, 2010, opinion; the non-medical opinion made by Donald Henson, Ph. D., who completed plaintiff's psychiatric review technique on January 19, 2011, and who asserted plaintiff had no medically determinable impairment (Tr. 507, 486-99); and the reported activities of plaintiff's daily living completed by plaintiff and plaintiff's sister in November 2010.

Here, within ALJ Onderak's disability finding, he independently rejected considering plaintiff's and her sister's November 2010 function reports because it only spoke to plaintiff's abilities after February 5, 2010. (Tr.718) Next, ALJ Onderak never relied on Donald Henson's opinion other than when determining whether plaintiff had a mental impairment. (Tr. 708-09). Thus, by elimination, the only reason that ALJ Onderak could have accepted from Dr. Oh's RFC

assessment as supportive for the onset determination was Dr. Wilkey's September 23, 2010, opinion. Yet, ALJ Onderak never discussed Dr. Wilkey's opinion of September 23, 2010, and this opinion conflicts with his onset determination date.

Furthermore, ALJ Onderak failed to explain how relying upon a physical RFC assessment that does not cite to or articulate reasoning based upon medical evidence prior to February 5, 2010, is relevant to and is supportive of a finding of "not disabled" from August 2008 through February 4, 2010. It is unclear how Dr. Oh's RFC assessment relates in any logical way to ALJ Onderak's disability determination of February 5, 2010, because this evidence does not relate back to plaintiff's alleged onset date, or any time during the relevant period at issue. It is clear this lack of logical explanation prevents meaningful review.

Moreover, in April 2011 Dr. Gonzalez reconsidered Dr. Oh's RFC assessment and affirmed it. Dr. Gonzalez stated she reviewed "all of the evidence in file," and explained her decision by discussing medical findings. (Tr. 519). However, none of the listed medical findings Dr. Gonzalez cited to and relied upon occurred during the relevant time period or prior to February 5, 2010. Dr. Gonzalez only articulated dates after plaintiff's disability determination of February 5, 2010, to affirm plaintiff's exertional RFC determination. Therefore, Dr. Gonzalez's April 2011 decision affirming the light work determination as of January 2011, which ALJ Onderak relied upon to support a February 5, 2010, disability onset date, bears no logical relation to the finding plaintiff was "not disabled" from August 14, 2008, through February 4, 2010. It actually contradicts the February 5, 2010, "disabled" finding because both agency consultants agreed plaintiff had the RFC to perform light work as late as January 2011. The ALJ's failure to discuss these contradictions and lack of logical explanation prevents meaningful review.

ALJ Ondernak failed to build the requisite logical bridge between the evidence and his

conclusions to allow for meaningful review. "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012), citing *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

It is not necessary to address plaintiff's other issues. Given the incredibly long history of this case, and ALJ Onderak's onset date determination, the Court holds that the ALJ on remand should first, properly apply the SSR 83-20 framework, being the ordered three step approach that requires starting with plaintiff's alleged onset date, and second, that the ALJ should engage in an adequate and thoughtful discussion of the evidence, both supportive and undermining. A thoughtful discussion by the ALJ would demonstrate logical rather than arbitrary reasoning, and allow for meaningful review. As for any other findings addressed on remand, the Court encourages the ALJ to employ sound logic and reasoning when engaging in discussion of all evidence, both supportive and undermining to any given conclusion.

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff was disabled during the period at issue or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Marjorie I. B.'s application for social security disability benefits is REVERSED and REMANDED to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATED: JUNE 19, 2018**

**s/ _J. Phil Gilbert_**
**J. PHIL GILBERT**
**UNITED STATES DISTRICT JUDGE**